UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DUANE ROBERTS,

           Plaintiff,                  Case No. 2:14-cv-11994
                                          District Judge Gerald E. Rosen
v.                                Magistrate Judge Anthony P. Patti

COMMISSIONER OF
SOCIAL SECURITY,

           Defendant.
_____/

**RECOMMENDATION TO DENY PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT (DE 14) AND TO GRANT DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT (DE 15)**

I.     **RECOMMENDATION**: For the reasons that follow, it is

**RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary

judgment (DE 14), **GRANT** Defendant's motion for summary judgment (DE 15),

and **AFFIRM** the Commissioner's decision.

II.   **REPORT:**

     Plaintiff, Duane Roberts, brings this action under 42 U.S.C. §§ 405(g) and

1383(c)(3) for review of a final decision of the Commissioner of Social Security

("Commissioner") denying his applications for disability insurance benefits (DIB)

and supplemental security income (SSI).  This matter is before the United States

Magistrate Judge for a Report and Recommendation on Plaintiff's motion for

1

summary judgment (DE 14), the Commissioner's cross motion for summary

judgment (DE 15), and the administrative record (DE 11).

## A.    Background[1]

Plaintiff protectively filed his applications for DIB and SSI on January 7,

2011, alleging that he has been disabled since January 1, 2009, at age 41.  R at

121-127, 128-135, 155-165, 166-168.  In his January 26, 2011 disability report,

Plaintiff alleged disability as a result of two herniated discs, pinched nerves in his

lower back and depression.  R at 170; *see also* R at 72, 76.  On February 28, 2011,

disability examiner Terri Gillies, SDM (Single Decision Maker), determined that

Plaintiff was not disabled at the initial level.  R at 52-71.  Therefore, his claims

were disapproved.  R at 72-79.

Plaintiff secured the representation of attorney Joshua Moore on March 21,

2011.  R at 80-81.  One week later, on March 28, 2011, Plaintiff sought a *de novo*

hearing before an Administrative Law Judge ("ALJ").  R at 30-31, 82-84, 201-202,

203-207.  ALJ Oksana Xenos held a hearing on January 11, 2013, at which

vocational expert (VE) Diane Regan testified.  R at 32-51.  Subsequently, on

---

[1] In most cases, "claims for benefits [are decided] using an administrative review
process that consists of four levels: (1) initial determination; (2) reconsideration
determination; (3) hearing; and (4) appeals."  Statement of Michael J. Astrue,
Commissioner, Social Security Administration before the Committee on Ways and
Means Subcommittee on Social Security, June 27, 2012
(http://www.ssa.gov/legislation/testimony_062712.html).

March 4, 2013, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act, §§ 216(i), 223(d) and 1614(a)(3)(A).[2]  R at 11-29.

Plaintiff requested review of the hearing decision on March 12, 2013.  R at 7-10, 227-229.  On March 25, 2014, the Appeals Council denied Plaintiff's request for review.  R at 1-6.  Thus, ALJ Xenos's decision became the Commissioner's final decision.

Plaintiff timely commenced the instant action on May 19, 2014.  DE 1.  The Commissioner filed an answer on August 4, 2014, along with a copy of the administrative record.  DE 10, DE 11.[3]

## B.     Plaintiff's Medical History

As mentioned above, Plaintiff alleges that he has been disabled since **January 1, 2009**.  Plaintiff's medical records span the period of time from **March 5, 2009** to **December 19, 2012**.  *See* R 230-459 [Exhibits 1F-14F].

Plaintiff saw Demian Naguib, M.D., PH.D of the Neurology Center of Michigan, a division of Physicians Health Care Network, in Port Huron, Michigan

---

[2] *See* 42 U.S.C. § 416(i) and 42 U.S.C. § 423(d) as to the DIB claim and 42 U.S.C. § 1382c(a)(3)(A) as to the SSI claim.

[3] This case was originally assigned to Judge Rosen and Magistrate Judge Whalen. This case was referred to Magistrate Judge Whalen for pretrial matters.  DE 4. However, on January 13, 2015, the case was reassigned from Magistrate Judge Whalen to me.  DE 16.

on several occasions during **2009** and **2010**.  *See*, *e.g.*, R at 307-311, 445-446

(**10/02/09**), 301-303 (**10/16/09**), 298 (**11/04/09**), 292-294 (**11/09/09**), 287-288

(**11/30/09**), 282-283 (**01/19/10**), 278-279 (**04/21/10**), 274-275 (**10/14/2010**), 270-

271 (**10/19/10**), 265-266 (**10/26/10**).  Dr. Naguib's **November 4, 2009** impressions

included lumbar spondylosis, chronic L5/S1 radiculopathy and bilateral tibial

nerve mononeuropathy at the ankle.  R at 298.   Dr. Naguib's **January 19, 2010**

impressions included muscle spasms and osteoarthritis.  R at 283.  Dr. Naguib re-

evaluated Plaintiff on **April 21, 2010**.  Dr. Naguib listed several impressions,

including intractable low back pain syndrome/lumbar osteoarthritic facet joints

spondylosis/lumbosacral radicular pain; cerebrovascular atherosclerosis;

gastroesophageal reflux disease; diabetes; hypertension; cervical and lumbar

osteoarthritic facet joints disease; degenerative joint osteoarthritis; and paraspinal

muscle spasms.  R at 279.

During **October 2011** – approximately one year since his **October 26, 2010**

visit with Dr. Naguib - Plaintiff was seen by Aaron K. Clark, M.D. at the Port

Huron Hospital.  Dr. Clark concluded that Plaintiff had:  a chronically occluded

distal right coronary artery; mild disease involving the left main, left anterior

descending artery, and left circumflex; and, mildly impaired left ventricular

systolic function.  R at 429-430.

Following a **November 1, 2011** ambulatory electrocardiogram, Bashar

Samman, M.D. of the Port Huron Heart Center – Cardiology Associations of Port

Huron, P.C. noted:

1. Sinus mechanism as baseline rhythm with episode of paroxysmal atrial fibrillation with no significant pauses.

2. Rare single PVCs.

3. Symptoms of shortness of breath did not correlate with any dysrhythmia.

R at 413.

Drs. Clark and Samman referred Plaintiff to the Port Huron Heart Center for

paroxysmal atrial fibrillation in the face of single vessel coronary artery disease,

mild cardiomyopathy, failure of Multaq[4] to control his symptoms, and atrial

fibrillation.  R at 392.  Ajay Krishen, M.D.'s **December 15, 2011** report notes:

1. Paroxysmal atrial fibrillation with shortness of breath.  No palpitations.

2. Diabetes.

3. Hypertension.

4. Obesity.

---

[4] "MULTAQ is a prescription medicine used to lower the chance that [a person] will need to go into the hospital for atrial fibrillation. It is meant for people who have had certain types of atrial fibrillation (paroxysmal or persistent AF) in the past, but are now in normal rhythm." *See* http://www.fda.gov/downloads/drugs/drugsafety/ucm171764.pdf, last visited May 26, 2015.

5.      Obstructive sleep apnea, on treatment.

6.      Coronary artery disease with occluded RCA [right coronary artery] and old inferior wall myocardial infarction with ejection fraction of about 45% by LV gram and is on Multaq to control his symptoms.

R at 392-393.  Later, following a **December 29, 2011** ambulatory electrocardiogram, Dr. Krishen reported:

1.      The 24-hour Holter monitor shows sinus mechanism with heart rate ranging from 50 to 143 beats per minute with an average of 70 beats per minute.

2.      Occasional PVCs and PACs.

3.      No atrial fibrillation.

R at 412.[5]

Dr. Krishen's **March 5, 2012** report noted that Plaintiff had diabetes, hypertension, obstructive sleep apnea, obesity, coronary artery disease with an occluded right coronary artery, and mild left ventricular dysfunction.  Dr. Krishen's impressions included paroxysms of atrial fibrillation on drug therapy, improved sense of energy level and improvement in his shortness of breath curing periods of sinus rhythm, coronary artery disease with a chronically occluded right

---

[5] "A Holter monitor is a machine that continuously records the heart's rhythms. The monitor is worn for 24 - 48 hours during normal activity."  *See* http://www.nlm.nih.gov/medlineplus/ency/article/003877.htm, last visited May 26, 2015.

coronary artery, hypertension, dyslipidemia, diabetes and obstructive sleep apnea. R at 390-391.

Following an **April 3, 2012** ambulatory electrocardiogram, Dr. Samman observed sinus mechanism baseline rhythm, rare ventricular ectopic activity, rare supraventricular ectopic activity, no evidence of atrial fibrillation and no reported symptoms.  R at 407.

Dr. Krishen's **August 7, 2012** report of a 30-day event monitor for the period from **June 18, 2012** to **July 18, 2012** revealed a sinus rhythm and one short run of non-sustained irregular atrial tachycardia/atrial fibrillation.  R at 405.

Plaintiff underwent an echocardiogram on **September 12, 2012** at the Port Huron Heart Center.  Dr. Samman's **September 13, 2012** report lists:  a mildly dilated LV with normal function, normal LV filling, mild concentric hypertrophy; normal right ventricular size with normal function; mildly dilated left atrium; normal right atrium; normal, trileaflet aortic valve, no aortic regurgitation; mild mitral regurgitation; normal tricuspid valve with trace tricuspid regurgitation; and, normal pulmonic valve with no pulmonic regurgitation.  R at 404.

Dr. Samman's **October 2012** progress notes list coronary artery disease with a known chronically occluded right coronary artery, status post ablation for atrial fibrillation (stable), morbid obesity (improving), diabetes mellitus, hypertension

and hyperlipidemia.  Dr. Samman adjusted Plaintiff's dose of Coumadin.  R at 395.[6]

Plaintiff again treated with Dr. Naguib on **December 6, 2012**.  R at 337, 439-444, 457-458.  Plaintiff was seen for intractable low back pain syndrome and lumbago with lumbosacral radicular pain and sprain; obstructive sleep apnea hypopnea syndrome; and lumbar myositis and sprain.  R at 439.  Dr. Naguib's impressions included intractable chronic low back pain syndrome, lumbar myositis and muscle spasms, and diabetic neuropathy.  R at 440.  Among other things, Dr. Naguib recommended an MRI, an EMG, and trigger point injections.  He also opined on Plaintiff's "marked limitations."  R at 441.  Plaintiff was started on Gabapentin.  R at 441, 458.

On **December 13, 2012**, Plaintiff was seen at Port Huron Hospital – Physical Therapy.  R at 323-336.  Plaintiff expressed difficulty with sitting more than 20 minutes.  R at 325.  His functional limitations included floor, knee and shoulder lifting of 10 pounds, carrying 10 pounds and overhead lifting of 5 pounds.  R at 330.

---

[6] "COUMADIN is prescription medicine used to treat blood clots and to lower the chance of blood clots forming in your body. Blood clots can cause a stroke, heart attack, or other serious conditions if they form in the legs or lungs." http://www.fda.gov/downloads/drugs/drugsafety/ucm088578.pdf, last visited May 27, 2015.

Plaintiff was again seen by Dr. Naguib on **December 14, 2012**.  R at 437-438, 451-456, 459.  Dr. Naguib's EMG & NCV findings revealed prolonged distal onset latency of the right peroneal motor and the right tibial motor nerves, as well as prolonged distal peak latency and decreased conduction velocity of the left sural sensory and the right sural sensory nerves.  R at 451.  Five (5) days later, on **December 19, 2012**, Plaintiff saw Dr. Naguib for a trigger point injection and sacroiliac joint injection without fluoroscopic guidance.  R at 432-436, 458.

### C.    Hearing Testimony (January 11, 2013)

#### 1.    Plaintiff's Testimony

Plaintiff lives with his wife and 2 kids (ages 18 and 12) in Birchville, Michigan.  R at 36-38, 47.  He drove to the video conference in Fort Gratiot, MI, which took about 10 minutes.  R at 36.  At the time of the hearing, he weighed 313 pounds and was 5 feet 10 inches tall.  His highest level of education was 12th grade, but he had been in special education since the 4th grade. R at 38.  According to Plaintiff, he does not read and write well, explaining he "can read the basic words . . ."  He can read about one paragraph, then his eyes start to hurt and he gets a really bad headache.  R at 46.

Plaintiff lived in Arizona from 2005 to 2008, and was not working there. R at 43-44.  Plaintiff testified that he was not currently working and it had been a couple of years since he worked, approximately since July 2010.  His last job was

driving patients to their doctor appointments.  He worked 3-4 days per week.  He stopped working, because his back started to hurt more than usual.  R at 38.

Plaintiff considered himself disabled, because his back hurts, explaining, "[i]f I stand it hurts worse, if I sit, you know, it hurts, and it's very painful."  R at 38-39.  According to Plaintiff, his back is the most serious problem preventing him from working full time.  R at 44.  His most comfortable position is lying down.  He usually sleeps from 3:00 a.m. and gets up around 9:00 a.m.  In the afternoon, he takes a nap for about 2.5 hours.  R at 39.

Plaintiff testified that he takes medication but still experiences pain.  Plus, he experiences nausea as a side effect.  He takes pills to help with the nausea, which sometimes offers relief.  R at 39-40.  He eats three meals a day, which are fixed by his wife.  He is not on any specific diet.  He tries to eat well and refrains from salt.  R at 40.

During the week, he will sometimes drive to the store, but not far.  R at 40.  Plaintiff will park in a handicapped spot and use a buggy to drive around.  R at 45.  He goes to church approximately twice per month.  R at 46.

Plaintiff can sit for 15-20 minutes, stand for five minutes and walk a half block.  He is not doing any exercises prescribed by a doctor.  R at 41.  He can lift about five pounds.  R at 41-42.  He was diagnosed with carpel tunnel a couple of years before the hearing, and this condition causes problems writing.  R at 42.  He

also had peripheral neuropathy, which causes numbness in his legs and pain.  R at 46.

He is not responsible for any housework; his wife and boys do everything. R at 42-43.  He spends his time watching television and sitting down.  R at 43.  He does not smoke cigarettes, and he "might have one [drink] at Christmas time but besides that [he] [doesn't] drink."  Plaintiff explained that he takes "too many pills to drink."  R at 44.

Plaintiff testified that he was currently having problems with anxiety or depression, which affect his social life.  He also has trouble concentrating.  For example, he frequently needs reminders to do things.  R at 45.  He described a period during which he overdosed on his insulin two times in three weeks, because he took the wrong medicine.  According to Plaintiff, his wife "usually gets the medicine for me."  R at 45-46.

### 2.    Vocational Expert Testimony

Diane Regan testified as the Vocational Expert ("VE") at the January 11, 2013 administrative hearing.  R at 47-51.[7]  VE Regan testified about available jobs in Southeast Michigan.  R at 47.  Assuming an individual of Plaintiff's age of 41 years at the alleged onset date, a 12th grade education and past work experience who can perform light exertional work, but who cannot climb ladders, ropes or

---

[7] *See also* R at 120 (Resume of VE), 208-209 (Vocational Consultant Case Analysis).

scaffolds, can occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl, and who can frequently operate foot or leg controls, VE Regan testified that such an individual could perform Plaintiff's past work as a driver.  VE Regan also testified that such an individual could, for example, perform the light, unskilled level jobs of a packer, assembler and sorter.  R at 48.

VE Regan further testified that, if a stand-at-will option was required, the driver position would be eliminated, and the other jobs identified would be reduced by half.  If such an individual could only perform work at a sedentary exertional level, he/she would not be able to perform any of his/her past work.  At the sedentary level, such an individual could be, for example, a packer, inspector or assembler.  R at 49.

However, VE Regan testified there would be no competitive employment if, "due to frequent episodes of pain and a combination of other impairments which would cause the individual to be off task up to 20 percent of the work day and therefore unable to sit, stand, and/or walk a total of eight hours five days a week on a regular and continuing basis."  R at 50.  Finally, when asked "[i]f a person needed to lie down throughout the day, totaling up to two hours of a work day during the eight-hour period, . . ." VE Regan testified that none of the jobs cited would be available.  R at 50-51.

### D.      The Administrative Decision (March 4, 2013)

#### 1.      Step One Analysis:  Gainful Activity

On March 4, 2013, ALJ Xenos issued her decision.  R at 11-29.  At step one of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 1, 2009.  R 16-17.[8]  Here, the ALJ found Plaintiff's testimony regarding his past work as a driver (R at 38) consistent with records for his earnings in 2009 and 2010 (R at 141-145, 150) and concluded that these earnings did not amount to substantially gainful activity.[9]

---

[8] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.      Is the claimant engaged in substantial gainful activity?
2.      Does the claimant suffer from one or more severe impairments?
3.      Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.      Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.      Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

[9] The record contains evidence of other queries/reports/records dated July 8, 2011.  *See* R at 136-139, R at 140, 146-147, 148-149 and 151-154.

13

### 2.   Step Two Analysis:  Impairments

At step two, ALJ Xenos found that Plaintiff had the following severe impairments:  degenerative disk disease, myositis, coronary artery disease, diabetes, osteoarthritis, and obesity.[10]  Xenos further found that Plaintiff had the following non-severe impairments:  carpal tunnel syndrome, sleep apnea, hypertension, GERD, and depression/anxiety.  R at 17-18.  Moreover, in concluding that Plaintiff's medically determinable mental impairment was non-severe, the ALJ noted there were mild limitations to the functional areas of activities of daily living, social functioning and concentration, persistence, or pace, and further noted that Plaintiff had not experienced extended episodes of decompensation.[11]

### 3.   Step Three Analysis:  The Listings

At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  R at 19-20.

---

[10] "Myositis means inflammation of the muscles that you use to move your body."
*See* http://www.nlm.nih.gov/medlineplus/myositis.html, last visited May 26, 2015.

[11] In this regard, Xenos relied upon portions of Plaintiff's testimony, as well as the January 7, 2011 SSA Field Office Disability Report (R at 166-168) the February 2, 2011 SSA Function Report (R at 189-200).  R at 18-19.

### 4.      Step Four Analysis:  The RFC

At step four, the ALJ found that Plaintiff had the RFC to perform sedentary work, with some exceptions.  R at 20-23.

### 5.      Step Five Analysis:  Jobs That Can Be Performed

At step five, ALJ Zenos found that there are jobs that exist in significant numbers in the national economy that the claimant can perform, such as:  a packer, with 2,500 jobs in the Southeast Michigan economy and 140,000 jobs nationally; inspector, with 2,000 jobs in the Southeast Michigan economy and 100,000 jobs nationally; and assembler, with 3,000 jobs in the Southeast Michigan economy and 150,000 jobs nationally.  R at 23-24.[12]  Thus, Xenos found that Plaintiff had not been under a disability, as defined by the Social Security Act, from January 1, 2009 through the date of her decision.  R at 25.

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see*

---

[12] Here, the ALJ relied upon the testimony of VE Regan (R at 47-51) and the Dictionary of Occupational Titles (DOT).  R at 24.

15

*also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a

decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

**F.     Analysis**

In his motion for summary judgment, Plaintiff asserts two statements of error:  (1) "the substantial evidence on the record demonstrates that controlling weight was not given to the objective medical evidence[,]" and (2) "the RFC determination by the ALJ did not accurately portray Mr. Robert's physical and mental impairments and nonexertional limitations."  DE 14 at 5.

The Commissioner opposes Plaintiff's motion, asserting that she is entitled to a grant of summary judgment, because (1) "substantial evidence supports the ALJ's assignment of little weight to the opinion of Plaintiff's treating neurologist[,]" and (2) Plaintiff has not demonstrated that "the ALJ omitted any significant physical or mental limitations from her [RFC] finding[.]"  DE 15 at 3. The Undersigned will address each argument in turn.

**1.     Substantial Evidence Supports the ALJ's assignment of little weight to the opinion of Plaintiff's treating neurologist (Dr. Naguib).**

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(d).  The regulations define

medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2). "Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists." 20 CFR § 404.1527(e)(2)(i). The ALJ must, however, "consider findings and other opinions" of State Agency medical or psychological consultants.

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ." 20 C.F.R. § 416.927(d)(2); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009). To qualify as a treating source, the physician must have an "ongoing treatment relationship" with the claimant. 20 C.F.R. § 404.1502.

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements, specifically:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the

18

specialization of the treating source—in determining what weight to
give the opinion.

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also Hill v.*

*Comm'r of Soc. Sec.*, No. 13-cv-15257, 2014 WL 6686789, at *15 (E.D. Mich.

Nov. 26, 2014) (Goldsmith, J., accepting recommendation of Morris, M.J.).

Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice

of determination or decision for the weight [the ALJ] give[s] [the claimant's]

treating source's opinion."  20 C.F.R. § 416.927(d)(2).  Accordingly, the ALJ's

reasoning "must be sufficiently specific to make clear to any subsequent reviewers

the weight the adjudicator gave to the treating source's medical opinion and the

reasons for that weight."  *Friend v. Comm'r of Soc. Sec.*, 375 F.App'x 543, 550

(6th Cir. 2010) (internal quotation omitted).  The United States Court of Appeals

for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants
> understand the disposition of their cases," particularly in situations
> where a claimant knows that his physician has deemed him disabled
> and therefore "might be especially bewildered when told by an
> administrative bureaucracy that she is not, unless some reason for the
> agency's decision is supplied."  *Snell v. Apfel*, 177 F.3d 128, 134 (2d
> Cir.1999). The requirement also ensures that the ALJ applies the
> treating physician rule and permits meaningful review of the ALJ's
> application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33
> (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45.  Thus, the reason-giving requirement is "particularly

important when the treating physician has diagnosed the claimant as disabled."

19

*Germany-Johnson v. Comm'r of Soc. Sec.*, 312 F.App'x 771, 777 (6th Cir. 2008)

(citing *Rogers*, 486 F.3d at 242).

In his motion, Plaintiff argues that "the ALJ failed to give controlling weight

to any objective medical evidence substituting her own findings for that of the

medical doctors." DE 14 at 8. According to Plaintiff,

> The ALJ does not give any rationale for her decision, only conclusory
> statements. There is no discussion of the objective medical evidence
> in the decision, no discussion of the factual basis for the decision, and
> not a single discussion in the decision of special factors such as
> medication side effects, fatigue, neuropathy and pain, that the Plaintiff
> suffers from. (While the medical records clearly reflect the Plaintiff
> suffers from neuropathy the ALJ never discusses this impairment in
> her decision.)

DE 14 at 11. Specifically, Plaintiff claims it was legal error for ALJ Xenos to

reject the medical opinion of Dr. Naguib, the treating physician, "for that of an

unnamed physical therapist who only saw Plaintiff on one occasion and Terry

Gill[i]es a single decision maker." DE 14 at 11. Moreover, Plaintiff suggests that

the ALJ should have recontacted Naguib and claims the ALJ ignored Dr. Krishen's

evidence. DE 14 at 13. Plaintiff also suspects that the ALJ impermissibly relied

upon the opinions of Terry Gillies. DE 14 at 14. It is Plaintiff's position that the

lack of specificity in ALJ Xenos's reasoning is legal error. DE 14 at 15.

The Undersigned will consider these issues in turn.

### a.     Dr. Demian Naguib (Treating Physician)

20

A treating physician's opinion is not entitled to controlling weight where it is not supported by other evidence in the record. *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014). With respect to the ALJ's conclusion that the diagnostic evidence in the December 2012 records from Dr. Naguib (R at 431-459 [Ex. 7F]) "reflects only mild issues[,]" R at 22, Plaintiff claims "[t]here is no basis in the medical records to find that the treating physician medical opinion is not appropriate[.]" DE 14 at 11-12. Instead, Plaintiff cites to the aforementioned November 4, 2009, January 19, 2010, April 21, 2010 and December 6, 2012 notes of Dr. Naguib (R at 279, 283, 298 & 441). It is Plaintiff's position that "[t]he ALJ dismisses the treating physician evidence with no basis whatsoever." DE 14 at 12.

However, in her RFC determination, the ALJ's explains why she accorded little weight to two of Dr. Naguib's opinions. First, in his notes from an October 14, 2010 neurology follow-up appointment, Dr. Naguib indicated that he "signed a temporary disability parking block card application for six months because of lumbar spondylosis and degenerative disc disease." R at 274-275. ALJ Xenos gave little weight to this opinion, explaining:

> . . . it is inconsistent with the record as a whole. Specifically, the diagnostic evidence in the record reflects only mild issues ([R at 431-459]). Additionally, the undersigned notes that the doctor's opinion is durational, covering only a six-month period. Furthermore, the undersigned notes that the issue of disability is ultimately reserved to the Commissioner (SSR 96-5p).

R at 22.

Second, in his December 10, 2012 notes from a December 6, 2012 neurology follow-up appointment, Dr. Naguib opined that Plaintiff had "marked limitations with his ability in extension of the lumbar spine and flexion, and side to side rotation, material handling, bending, squatting, overhead lift, and over-shoulder lift[,]" and prescribed a functional capacity evaluation "to determine his exact baseline disabilities."  R at 441.  Plaintiff contends that the ALJ did not make any attempt to explain why the limitations in Dr. Naguib's December 10, 2012 notes would be unreasonable "nor does she state any factual basis for rejecting Dr. Naguib's medical opinion with regards to functional limitations."  DE 14 at 12.  However, ALJ Xenos gave little weight to this opinion either, explaining:

> While the record evidences limitations with respect to the claimant's back issues, the record as a whole evidences no more than moderate limitations.  Specifically, the claimant's activities of daily living, including driving, shopping in stores, preparing meals, and playing video games, indicate that the claimant is capable of working at the limited range of sedentary work identified above ([R at 189-200 (February 2, 2011)]).  Moreover, the EMG studies and other diagnostic findings, discussed above, do not support marked limitations ([R at 431-459 (December 2012), R at 460-491 (March – June 2011)]).

R at 22.

In each of these cases, ALJ Xenos instead relies upon EMG studies and/or diagnostic evidence in Exhibit 7F (R at 431-459) and/or Exhibit 8F (R at 460-491).  Thus, it appears that, in addition to Plaintiff's February 2, 2011 Function Report (R at 189-200), the ALJ was more persuaded by the results of the June 23, 2011 X-ray

of the lumbar spine (R at 469) and the December 14, 2012 electromyogram (EMG)

test and nerve conduction velocity (NCV) test (R at 437, 451-456), *i.e.*, by

objective diagnostic tests.

Finally, Plaintiff suggests that the ALJ should have recontacted Naguib as

set forth in SSR 96-5p.  DE 14 at 13.  With regard to the requirements for

recontacting treating sources, the regulations provide:  "Because treating source

evidence (including opinion evidence) is important, if the evidence does not

support a treating source's opinion on any issue reserved to the Commissioner and

the adjudicator cannot ascertain the basis of the opinion from the case record, the

adjudicator must make 'every reasonable effort' to recontact the source for

clarification of the reasons for the opinion."  SSR 96-5p, 1996 WL 374183, 6 (July

2, 1996).  Here, Plaintiff relies upon *Sims v. Apfel*, 530 U.S. 103, 111 (2000)[13] and

*D'Angelo v. Commissioner of Social Sec.*, 475 F.Supp.2d 716, 722 (W.D. Mich.

2007).[14]

However, "[g]enerally, an Administrative Law Judge need recontact a

medical source only if the evidence received from that source is 'inadequate' for a

---

[13] "It is the ALJ's duty to investigate the facts and develop the arguments both for
and against granting benefits . . . ."  *Sims*, 530 U.S. at 111.

[14] "The record includes virtually no medical records of [P]laintiff's treatment with
Dr. Bleiberg.  Given the lack of support for Dr. Bleiberg's opinions restricting
plaintiff to less than full-time sedentary work, the ALJ should have performed
further investigation pursuant to SSR 96–5p . . . ."  *D'Angelo*, 475 F.Supp.2d at
722.

disability determination." *DeBoard v. Commissioner of Social Sec.*, 211 F.App'x 411, 416 (6th Cir. 2006). "Absent a gap in the record, the ALJ has no duty to recontact the physician." *Starkey v. Commissioner of Social Sec.*, No. 1:06-CV-693, 2008 WL 828861, 4 (W.D. Mich. Mar. 26, 2008) (Neff, J., approving report and recommendation of Brenneman, M.J.). As the Commissioner contends (DE 15 at 15-16), and as illustrated throughout this report, Plaintiff has not demonstrated that the evidence in his case was too insufficient to permit ALJ Xenos to reach a decision.

Thus, substantial evidence supports the ALJ's decision to afford little weight to the treating neurologist's (Dr. Naguib's) opinion.

### b.    Physical Therapist (Port Huron Hospital)

The ALJ attributed great weight to the limitations set forth in the records of Plaintiff's December 13, 2012 physical therapy initial evaluation at Port Huron Hospital (R at 324-330 (Ex. 4F)), because the limitations were consistent with objective evidence such as the EMG and diagnostic studies found in Exhibits 7F (R at 431-459) and 8F (R at 460-491). R at 22. Here, based upon earlier references to these exhibits, it appears the ALJ is relying upon the June 23, 2011 X-ray of the lumbar spine (R at 469) and the December 14, 2012 EMG and diagnostic studies (R at 431-459 (Ex. 7F), 437 & 451-456). R at 21.

As the Commissioner contends (DE 13-14), the ALJ discussed the objective medical evidence in the record at length (R at 21-22), including the December 13, 2012 physical therapy evaluation, which set forth functional limitations for occasional material handling (R at 330), and the December 14, 2012 test, which revealed several "mild" impressions (R at 437). These differ from Dr. Naguib's December 6, 2012 impression that Plaintiff had "marked limitations." R at 441. Thus, as Defendant accurately observes, the ALJ "demonstrated that substantial record evidence was inconsistent with Dr. Naguib's opinion, and relied upon that substantial evidence to afford his opinion little weight." DE 15 at 14; *see Sullenger v. Commissioner of Social Sec.*, 255 F.App'x 988, 994 (6th Cir. 2007) ("The Second ALJ did not err in discounting Zetter's opinion on Sullenger's physical limitations because: (1) it was not supported by sufficient clinical findings; and (2) it was contradicted by substantial medical evidence."). In other words, the ALJ had well-supported reasons for giving greater weight to the physical therapy records than to the Plaintiff's treating physician.

### c.    Ajay Krishen, M.D. (Port Huron Heart Center)

Plaintiff was evaluated by Dr. Krishen of the Port Huron Heart Center on at least four occasions, each of which is addressed above. R at 392-393 (12/15/2011), R at 412 (12/29/2011), R at 390-391 (03/05/2012) & R at 405 (08/07/12 notes regarding June-July 2012 test). Citing Dr. Krishen's December

15, 2011 and March 5, 2012 notes (R at 390-393), Plaintiff contends that the ALJ "ignored the medical evidence from Dr. Krishen which demonstrates numerous health problems from Plaintiff's coronary artery disease including a chronically occluded right coronary artery, as well as the need for Coumadin therapy on a regular and continuing basis." DE 14 at 13. However, the Commissioner contends that the ALJ did consider Plaintiff's coronary artery disease in her RFC findings. DE 15 at 16.

In fact, the ALJ determined that coronary artery disease was among Plaintiff's severe impairments. R at 17. Moreover, even if the ALJ ignored Dr. Krishen's other reports, within her RFC finding the ALJ did consider Dr. Krishen's report on a December 29, 2011 ambulatory electrocardiogram (R at 412) and Dr. Krishen's August 7, 2012 report on the 30-Day (June 18, 2012 – July 18, 2012) Event Monitor (R at 405), as well as Dr. Clark's report from what appears to have been an October 2011 cardiac catheterization (R at 430); Dr. Samman's report on a November 1, 2011 ambulatory electrocardiogram (R at 413); and Dr. Samman's October 12, 2012 progress notes (R at 395). R at 21.

In particular: Dr. Samman's notes from the April 3, 2012 ambulatory electrocardiogram concluded that there was no evidence of atrial fibrillation (R at 407); Dr. Samman's notes from the September 12, 2012 echocardiogram show, among other things, a mildly dilated left ventricle with normal function, mild

concentric hypertrophy, mildly dilated left atrium and mild mitral regurgitation (R at 404); and Dr. Samman's October 12, 2012 progress notes indicate "[c]oronary artery disease with a known chronically occluded right coronary artery[,]" and "[s]tatus post ablation for atrial fibrillation, stable[,]" while also noting an adjustment in the dose of Coumadin (R at 395).  Thus, as Defendant points out, "[t]he longitudinal evidence establishes that Plaintiff experienced improvement with medications and ablation of his atrial fibrillation."  DE 15 at 16.

### d.    Terri Gillies, SDM

With respect to Plaintiff's DIB and DI claims, Terri Gillies, SDM (Single Decision Maker), determined that Plaintiff was not disabled.  R at 52-60, 70; 61-69, 71.  Referring to Gillies's DIB decision, Plaintiff contends that ALJ Xenos's sedentary RFC is "completely in step" with Gillies's opinion, implying that there was no independent analysis.  Plaintiff further contends that ALJ Xenos was not entitled to use Gillies's medical opinions, because "no medical professional signed off on the adopted RFC."  DE 14 at 14.  On the other hand, the Commissioner disagrees that the ALJ's sedentary RFC finding is "completely in step" with Gillies opinion and offers that the ALJ independently reached some of the same RFC conclusions as did Gillies.  DE 15 at 17.

As this Court has acknowledged, "under the regulations and agency policy, SDM assessments have no place in an ALJ's disability determination."  *White v.*

27

*Commissioner*, No. 12-12833, 2013 WL 4414727, *8 (E.D. Mich. Aug. 14, 2013) (Murphy, J.) (adopting report and recommendation of Michelson, M.J.). *See also Hensley v. Commissioner of Social Security*, No. 10-11960, 2011 WL 4406359, *1 (E.D. Mich. Sept. 22, 2011) (Steeh, J.) (accepting and adopting report and recommendation of Hluchaniuk, M.J.) (reversing the Commissioner's findings and remanding the case, where the ALJ gave great weight to the non-physician SDM's opinion, the ALJ believed the SDM was a DDS [Disability Determination Services] physician, and the SDM's assessment was not affirmed and adopted by a ". . . by a second state agency consultant and physician.").

However, Defendant accurately contends, and Plaintiff does not contest by way of a response, that ALJ Xenos's decision "did not mention, much less adopt or assign controlling weight to Ms. Gillies' conclusions." DE 15 at 16. Moreover, comparing the exertional and postural limitations set forth in SDM Gillies's RFC findings (R at 57-58, 66-67) with the limitations set forth in the ALJ's sedentary RFC finding (R at 20), Defendant correctly notes that "[t]he ALJ assessed *greater limitations* than did Ms. Gillies . . . ." DE 15 at 17 (emphasis added). For example, the ALJ found that Plaintiff could occasionally climb stairs and ramps, balance, and kneel (R at 20), whereas the SDM found that Plaintiff could frequently climb ramps and stairs, balance and kneel (R at 58). The ALJ also required a sit/stand at will option at the workstation (R at 20), while this was not a

28

limitation identified in the SDM's exertional limitations for sitting, standing and/or walking (R at 57). Also, the ALJ noted that Plaintiff could occasionally reach overhead and should avoid vibration (R at 20), while the SDM did not list any manipulative or environmental limitations (R at 58). This is indicative of the fact that the ALJ did not give undue influence to the SDM's opinion and, instead, independently considered the record as a whole, as required by the regulations.

Thus, the Court should agree with Defendant that "[t]he mere fact that the ALJ independently reached some of the same RFC conclusions as did Ms. Gillies does not compel a conclusion that [s]he relied upon her opinion." DE 15 at 17; s*ee Redlin v. Colvin*, No. 11-15671, 2013 WL 1316956, *5 (E.D. Mich. Mar. 29, 2013) (Cohn, J.) (adopting report and recommendation of Randon, M.J.) ("Plaintiff is correct that forms completed by a SDM 'are not opinion evidence at the appeal levels.' *See* POMS DI 24510.050. However, as the Commissioner notes, there is no indication that the ALJ considered a SDM's opinion when determining Redlin's RFC. The ALJ did not make any reference to a SDM opinion.").

### e.    Conclusion

In the instant matter, the ALJ considered all medical opinions she received in evaluating the claimant's case, gave good and sufficiently specific reasons for the diminished weight given to the treating physician's opinion, and carefully considered the record as a whole. There is no basis for reversal or remand.

**2.    Plaintiff has not demonstrated that the ALJ omitted any significant physical or mental limitations from her residual functional capacity (RFC) finding.**

Plaintiff's RFC is "the most [he or she] can still do despite the physical and mental limitations resulting from [his or] her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of Plaintiff's RFC is an issue reserved to the Commissioner and must be supported by substantial evidence. 20 C.F.R. §§ 404.1527(3), 416.927(e). "'ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.'" *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)).

Pursuant to Social Security Rule 96-8p, the RFC assessment must include:

[A] narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96-8p, 1996 WL 374184, at *6-7 (July 2, 1996). In his motion, Plaintiff generally argues that "the finding that Plaintiff has severe physical and mental

30

impairments, along with non-exertional impairments such as pain and medication side effects[,] were not factored into the residual functional capacity assessment (RFC)." DE 14 at 8. In other words, citing *Varley v. Secretary of Health & Human Services*, 820 F.2d 777, 779 (6th Cir. 1987),[15] Plaintiff argues that the ALJ's RFC determination "did not accurately portray Mr. Roberts' physical and mental impairments and nonexertional limitations." DE 14 at 16-18. In support of this argument, Plaintiff contends that "[t]he ALJ listed no objective medical evidence nor does the ALJ offer any analysis or insight through the decision into her [RFC] determination." DE 14 at 16. Mainly, Plaintiff takes issue with what he claims to be *missing* from the ALJ's decision; in other words, Plaintiff claims the ALJ did not comply with SSR 96-8p's narrative discussion requirements, such as evaluating "whether based on claimant's combined physical and mental limitations [he] is capable of a competitive work schedule . . . ." *See* DE 14 at 15, 17.

### a.    Physical Impairments

Plaintiff's argument that the ALJ's RFC determination did not accurately portray Plaintiff's physical impairments (*see* DE 14 at 16) is unavailing. For example, Plaintiff alleges that "Judge Xenos does not factor in her RFC

---

[15] "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question, but only 'if the question accurately portrays [plaintiff's] individual physical and mental impairments.'" *Varley*, 820 F.2d at 779 (quoting *Podedworny v. Harris,* 745 F.2d 210, 218 (3d Cir.1984)).

determination her own previous conclusion that Plaintiff has the severe

impairments of degenerative disk disease; myositis; coronary artery disease;

diabetes; osteoarthritis; and obesity." DE 14 at 16. Moreover, citing some of Dr.

Naguib's notes from 2010 (R at 266, 270, 271 & 283) and Dr. Clark's 2011 cardiac

catheterization (R at 430) and a December 19, 2012 consent for trigger point

injection (R at 435), Plaintiff contends that ALJ Xenos did not mention that

"Plaintiff has undergone back injections, his lumbar disk herniation at T12-L1 with

mild anterior sac compression, lumbar spondylosis, lumbar radiculopathy, facet

joint syndrome, chronically occluded right artery, and Coumadin therapy." It is

Plaintiff's position that the ALJ did not include each of the limitations she found in

the RFC and discuss how such limitations affect Plaintiff's ability to perform

sustained work. DE 14 at 17.

However, as Defendant points out (DE 15 at 18-19), "'[s]edentary work'

represents a significantly restricted range of work, and individuals with a

maximum sustained work capability limited to sedentary work have very serious

functional limitations." 20 CFR Pt. 404, Subpt. P, App. 2 § 200.00(h)(4). Within

the ALJ's RFC finding (R at 20-23), she cited a multitude of medical records, as

well as other records, reports and Plaintiff's testimony, as discussed above in

Section D.4. More importantly, ALJ Xenos did not need to directly address each

piece of evidence in her decision. *Bailey v. Commissioner of Social Sec.*, 413

32

F.App'x 853, 855 (6th Cir. 2011) ("But [an ALJ] is not required to analyze the relevance of each piece of evidence individually.  Instead, the regulations state that the decision must contain only 'the findings of facts and the reasons for the decision.'") (quoting 20 C.F.R. § 404.953); *Kornecky v. Commissioner of Social Security*, 167 F.App'x 496, 508 (6th Cir. 2006) ("'[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'") (quoting *Loral Defense Systems–Akron v. N.L.R.B.,* 200 F.3d 436, 453 (6th Cir.1999)).

Here, although the ALJ concluded that the medical records do not support Plaintiff's allegations of limitations (R at 21-23), the ALJ still imposed several limitations in her RFC finding (R at 20).  Specifically, the ALJ found that Plaintiff had the RFC to perform sedentary work, with certain exceptions, such as Plaintiff: cannot climb ladders, ropes, or scaffolds; can occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl; requires a sit/stand at will option at the workstation; can frequently operate foot/leg controls; can occasionally reach overhead; and should avoid vibration.  R at 20.  Then, considering Plaintiff's age, education, work experience and RFC, the ALJ concluded that "there are jobs that exist in significant numbers in the national economy that the claimant can perform[.]"  R at 23-24. Thus, the RFC is of a limited nature.

**b.     Mental Impairments**

Preliminarily, the ALJ did not find a severe *mental impairment*, although she did find that *depression/anxiety* was among Plaintiff's *non-severe* impairments. *See* DE 15 at 17-18. As to Plaintiff's assertion that it was legal error for the ALJ to reject, without explanation, Plaintiff's severe *impairments of depression and anxiety* (DE 14 at 16), the ALJ's Step 2 discussion (R at 17-19) considered certain records of the Port Huron Hospital Outpatient Counseling Center (R at 340-367), as well as certain records of Aaron Clark, M.D. (R at 530-547, R at 569-591) and a portion of the February 28, 2011 disability determination explanation (R at 61-69). Specifically, the ALJ relied upon the July 2012 and August 2012 notes of Dr. Clark (R at 531-534, 535-538), the October 2012 notes of Robert Bauer, D.O. (R at 359-360) and the December 6, 2012 notes of Aaron K. Clark, M.D. (R at 575-579). R at 17.[16] Similarly, Plaintiff seems to take issue with the ALJ's failure to discuss her Step 2 finding of a non-severe mental impairment of depression/anxiety (R at 17-19) within her Step 4 RFC finding (R at 20-23). *See*, *i.e.*, DE 14 at 8, 15.[17]

---

[16] The ALJ gave little weight to the September 28, 2012 Outpatient Psychiatric Evaluation Note (R at 355-357) and the October 11, 2012 Port Huron Hospital – Outpatient Counseling Center's Master Treatment Plan (R at 366-367). R at 17. ALJ Xenos also gave little weight to the February 24, 2011 assessment of State agency psychological consultant Blaine Pinaire, Ph.D.: "No mental medically determinable impairments established[.]" *See* R at 65, R at 18.

[17] Where the ALJ made a Step 2 finding that Hicks had a non-severe mental impairment of affective disorder, "the ALJ was required to consider the effects of Hicks's non-severe mental impairment along with her severe physical impairments in determining her RFC." *Hicks v. Commissioner of Social Sec.*, No. 12-13581,

However, even though the ALJ did not cite the outpatient counseling records (R at 340-367 [Ex. 5F]) in the Step 4 RFC finding, the ALJ's Step 2 cites some of those records (R at 17-18), and the ALJ's Step 2 finding further states, "there is no evidence that the claimant's depression/anxiety significantly limits his ability to perform basic work activities." R at 18. Thus, the ALJ's explanation of her rejection of depression and anxiety was given, back in her Step II finding, and careful consideration was given to voluminous records in that regard.

Moreover, Plaintiff's motion for summary judgment (DE 14) does not challenge the ALJ's Step 2 finding, nor has Plaintiff filed a response to Defendant's motion for summary judgment (DE 15). Thus, a challenge to the ALJ's Step 2 finding has been waived. *Stiltner v. Commissioner of Social Security*, 244 F.App'x 685, 686 (6th Cir. 2007) ("Stiltner waived any argument regarding Dr. Odell by not including it in her brief."); *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010) (in a habeas case, "arguments made to us for the first time in a reply brief are waived.").

### c.   Daily Activities

Plaintiff takes issue with the ALJ's treatment of his daily activities. For example, Plaintiff claims it was legal error for ALJ Xenos to dismiss the limitations imposed by the treating physician based on "over exaggerated daily

---

2013 WL 3778947, 2 (E.D. Mich. July 18, 2013) (Cleland, J.) (adopting report and recommendation of Grand, M.J.).

activities she alleges the Plaintiff to perform[,]" and maintains that "the Plaintiff's daily activities are not a determination for how to weigh a treating physician medical opinion." DE 14 at 12. Later, referring to his January 11, 2013 testimony (R at 38-46), and contending that the ALJ did not mention Plaintiff's need to lie down during the day, severe nausea from medication, limitations on sitting, standing and housework, need for a buggy at the grocery store, need for reminders and pain in his legs from peripheral neuropathy, Plaintiff asserts that the ALJ exaggerated his daily activities and only addressed the first of 20 C.F.R. § 404.1529(c)(3)'s factors. DE 14 at 18.

"The ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor." *Infantado v. Astrue,* 263 F. App'x 469, 475 (6th Cir. 2008). Nevertheless, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters v. Comm'r Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters,* 127 F.3d at 531. When assessing an individual's credibility, "the ALJ must [first] determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged." *Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x 370,

36

371 (6th Cir. 2011). The ALJ made this finding here, concluding that Plaintiff's

medically determinable impairments "could reasonably be expected to cause the

alleged symptoms[.]" R at 21.

Upon making such a finding, the ALJ must next "consider the entire case

record" to "evaluate the intensity, persistence, and functional limitations of the

symptoms considering objective medical evidence." 20 C.F.R. § 404.1529(c)(1-3);

Soc. Sec. Rul. 96-7p. A *non-exhaustive* list of relevant factors to be considered by

the ALJ include: 1) the claimant's daily activities; 2) location, duration, frequency,

and intensity of pain; 3) precipitating and aggravating factors; 4) the type, dosage,

effectiveness, and side effects of medication; 5) treatment, other than medication;

6) any measures the claimant uses or has used to relieve his or her pain or other

symptoms; and 7) other factors concerning functional limitations and restrictions.

*Curler v. Comm'r of Soc. Sec.*, 561 F. App'x 464, 474 (6th Cir. 2014); 20 C.F.R. §

404.1529(c)(1-3); Soc. Sec. Rul. 96-7p; *see also Ewing v. Astrue*, No. 10-cv-1792,

2011 WL 3843692, at *9 (N.D. Ohio, Aug 12, 2011) ("Social Security Ruling 96-

7p requires such factors to be *considered*, not *discussed* . . . .") (emphasis in

original) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir.

2006)).

"[A]n ALJ is not required to accept a claimant's subjective complaints and

may properly consider the credibility of a claimant when making a determination

37

of disability." *Jones v. Commissioner of Social Sec.*, 336 F.3d 469, 475-476 (6th Cir. 2003).  In his or her opinion, the ALJ must "provide a sufficiently specific explanation for his [or her] credibility determination so that it is clear to the individual and any subsequent reviewers the weight given to the individual's statements and the reasons for that weight." *Malcom v. Comm'r of Soc. Sec.*, No. 13-15188, 2015 WL 1539711, at *7 (E.D. Mich. Mar. 27, 2015) (citing *Soc. Sec. Rul.* 96-7, 1996 WL 374186, at *1 (July 2, 1997)).

Here, the ALJ provided a sufficiently specific explanation for her credibility determination as to Plaintiff's daily activities.  In examining Plaintiff's activities of daily living (R at 22-23), the ALJ specifically referenced the daily activity section of Plaintiff's February 2, 2011 SSA function report (R at 190-194).  On this form report, Plaintiff, himself, acknowledged that his daily activities include using the bathroom, taking pills, checking blood, watching television, moving from spot to spot to try to get comfortable and working if there is any work (R at 190) and noted that he prepares his own meals by warming up food (but not cooking), he drives or rides in a car when going out, he does a limited amount of shopping in stores, and he plays on the computer / Xbox / television (R at 191-193).   The ALJ permissibly considered Plaintiff's own representations in the SSA Function Report (R at 22-23) when considering Plaintiff's credibility.  *See Hogg v. Sullivan, 987*

*F.2d 328, 333 (6th Cir. 1993),*[18] *Young v. Secretary of Health & Human Services,*

*925 F.2d 146, 150 (6th Cir. 1990),*[19] *Sizemore v. Secretary of Health and Human*

*Services*, 865 F.2d 709, 713 (6th Cir. 1988).[20]

Furthermore, the ALJ expressly stated that she complied with Social

Security Rule 96-7p, which requires her to consider a non-exhaustive list of factors

in determining credibility.  R. at 20.  There is no indication that she failed to do so.

*See, e.g.*, *Malcolm*, 2015 WL 1439711 at *8 (concluding that, in light of the

Court's deferential approach to credibility assessments, the ALJ's express

statement of compliance was persuasive). Social Security Rule 96-7p, in

accordance with 20 C.F.R. § 404.1529, requires the ALJ to consider the claimant's

---

[18] With respect to Step 3, "[t]he evidence tends to show that Hogg did not experience marked restrictions in activities in her daily living. She herself stated that she was able to care for herself and her son, and that she was able to maintain an active schedule of daily activities, including attending church and vocational training, visiting relatives, and driving herself."  *Hogg*, 987 F.2d at 333.

[19] "Young takes care of her personal needs and finances, she dusts, washes dishes, goes grocery shopping, cooks, reads, watches television for several hours, drives an automobile and runs various errands, and she occasionally dines out and goes to the movies.  We find that this evidence amply supports the Secretary's finding that Young's daily activities are no more than slightly restricted."  *Young*, 925 F.2d at 150.

[20] With regard to the ALJ's conclusion that Plaintiff's claims of disabling pain were not credible, "the appellant's own testimony disclosed that he was able to drive an automobile, shop, do housework, visit relatives regularly and babysit his grandson occasionally, read and view television, feed the chickens daily and garden from time to time."  *Sizemore*, 865 F.2d at 713.

activities of daily living.  As addressed above, the ALJ did just that, and included such consideration in her credibility determination.

Thus, the ALJ's RFC finding is not upended by her treatment of Plaintiff's daily activities.

### d.    Work Activity Since Alleged Onset Date

In determining Plaintiff's RFC, the ALJ noted that "the record reflects work activity after the alleged onset date."  Among other things, the ALJ noted that this work activity suggests that "the claimant's impairments would not prevent work activity and reflects negatively on the credibility of the claimant's allegations of disability."  R at 23.  Plaintiff takes issue with the ALJ's negative treatment of Plaintiff's post-alleged onset work activity.  *See* DE 14 at 18.

Even though the ALJ considered Plaintiff's testimony regarding his past work as a driver (R at 38), records for his earnings in 2009 and 2010 (R at 141-145, 150), and a March 23, 2011 intake form from St. Joseph Mercy physical therapy (R at 481), the SSA regulations provide that "[e]ven if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did."  20 CFR § 404.1571.  As the Sixth Circuit has noted, "the ALJ did not err by considering [Plaintiff's] ability to maintain part-time employment as one factor relevant to the determination of whether he was

disabled." *Miller v. Commissioner of Social Sec.*, 524 F.App'x 191, 194 (6th Cir.

2013).

### e.    Sedentary Work and the Burden of Proof

Plaintiff asserts that "[t]here is not a scintilla of evidence to support [the

ALJ's] RFC assessment that Plaintiff would be capable of sedentary work on a

sustained basis." DE 14 at 16.  Here, Plaintiff contends that "[t]here was no

evaluation by the ALJ as to whether the Plaintiff needed to lay down during

unscheduled work breaks, would need to elevate his feet, requires a cane, or has

concentration problems related to Plaintiff's severe fatigue, memory, and pain

issues."  DE at 16.

Defendant points out that it is the claimant's burden to prove his RFC.  DE

15 at 21; *see Her v. Commissioner of Social Sec.*, 203 F.3d 388, 391 (6th Cir. 1999)

("the burden of proof lies with the claimant at steps one through four of the

process, culminating with a claimant's proof that she cannot perform her past

relevant work."); *see also Isaac v. Commissioner of Social Sec.*, No. 12-13324,

2013 WL 4042617, *7, *11 (E.D. Mich. Aug. 9, 2013) (Goldsmith, J., adopting

recommendation of Michelson, M.J.) (same).

Plaintiff has not satisfied his burden to challenge the ALJ's RFC finding.

Even if, as Plaintiff contends, the ALJ never discusses medication side effects,

fatigue, neuropathy and pain (*see* DE 14 at 11), Plaintiff has not shown this

41

omission was harmful.  *See Shinseki, Secretary of Veterans Affairs v. Sanders*, 556

U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally

falls upon the party attacking the agency's determination.").

### f.    Conclusion

In the end, as noted above, the ALJ's sedentary RFC finding included

several specific limitations (R at 20), and the ALJ gave great weight to the

functional limitations set forth by the physical therapist (R 22), which noted

difficulty with sitting, standing, walking, stairs, lifting, pouring a gallon of milk,

taking socks or shoes on or off (R at 325), and functional limitations with material

handling (R at 330).  Thus, the ALJ's conclusion that Plaintiff has the RFC to

perform sedentary work, except that he "cannot climb ladders, ropes, or scaffolds;

can occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl;

requires a sit/stand at will option at the workstation; can frequently operate foot/leg

controls; can occasionally reach overhead; and should avoid vibration[,]" R at 20,

is supported by the physical therapy records.

### G.    Summary

In sum, from a review of the record as a whole, the Undersigned concludes

that substantial evidence supports the ALJ's decision denying benefits.

Accordingly, it is **RECOMMENDED** that the Court **DENY** Plaintiff's motion for

summary judgment (DE 14), **GRANT** Defendant's motion for summary judgment (DE 15), and **AFFIRM** the Commissioner of Social Security's decision.

## III.   NOTICE TO PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 932 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections,

in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.* If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated: June 9, 2015

  s/Anthony P. Patti  
Anthony P. Patti  
UNITED STATES MAGISTRATE JUDGE

I hereby certify that a copy of the foregoing document was sent to parties of record of record on June 9, 2015, electronically and/or by U.S. Mail.

  s/Michael Williams  
Case Manager for the  
Honorable Anthony P. Patti